Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| CARMEN SILVA SERRANO Y/O RAÚL MARQUEZ CRUZ<br><br>Recurrida<br><br>v.<br><br>CLEMBER LLC MANUEL CLEMENTE ROSADO, SU ESPOSA Y LA SOCIEDAD LEGAL DE GANANCIALES<br><br>Recurrente | KLRA202300525 | *REVISIÓN ADMINISTRATIVA* Procedente del Departamento de Asuntos al Consumidor<br><br>Núm.: CAG-2021-0002696<br><br>Sobre: Contrato de obras y servicio |

Panel integrado por su presidenta, la Jueza Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera

Álvarez Esnard, jueza ponente

## **SENTENCIA**

En San Juan, Puerto Rico, a 20 de mayo de 2024.

Comparece ante nos el señor Manuel Clemente Rosado ("Recurrente" o "señor Clemente Rosado") mediante *Recurso de Revisión* presentado el 10 de octubre de 2023. Nos solicita la revocación de una *Resolución* emitida el 14 de agosto de 2023 y notificada el 15 de agosto de 2023 por el Departamento de Asuntos del Consumidor ("DACo"). Por virtud de la misma, el DACo declaró *Ha Lugar* la *Querella* del caso de epígrafe. Oportunamente, el Recurrente presentó una *Solicitud de Reconsideración*. Evaluados sus argumentos, el 8 de septiembre de 2023, la aludida agencia emitió una *Resolución en Reconsideración*, notificada el 13 de septiembre de 2023, en la cual declaró *No Ha Lugar* la referida petición.

Por los fundamentos que exponemos a continuación, **confirmamos** el dictamen recurrido.

Número Identificador

SEN(RES)2024_____

**I.**

El 22 de julio de 2022, la señora Carmen Silva Serrano y el señor Raúl Márquez Cruz (conjuntamente, "Recurridos") presentaron una *Tercera Querella Enmendada* contra el señor Clemente Rosado ante el Departamento de Asuntos del Consumidor.[1] En ajustada síntesis, alegaron que el 23 de noviembre de 2020 suscribieron un contrato de servicios con el representante corporativo de Clember Corp. En lo concerniente, aseveraron que pactaron la construcción de un muro de contención en el plazo de dieciocho (18) semanas a cambio de $55,000.00. No obstante, indicaron que el Recurrente empezó a ausentarse, a pesar de que habían depositado el 95% del precio acordado. Adujeron que remitieron a éste una carta certificada con acuse de recibo, en la cual expusieron su inquietud en torno a la posibilidad de derrumbe en el terreno. Sin embargo, alegaron que el correo postal devolvió dicho comunicado, pues el Recurrente no acudió a buscar la correspondencia. Advirtieron, además, que a la fecha del contrato no existía la mencionada corporación debido a que el Departamento de Estado revocó su incorporación. Por lo anterior, solicitaron la nulidad del contrato y $78,125.34 en concepto de daños y perjuicios.

En respuesta, el 15 de febrero de 2023, el señor Clemente Rosado sometió su *Contestación a Tercera Querella Enmendada.*[2] En esencia, alegó que la parte querellante modificó el término para completar la obra. Detalló que a mediados de febrero de 2021 acordaron verbalmente pausar los trabajos hasta el mes de abril de 2021. Adujo, además, que la parte querellante unilateralmente resolvió el contrato de obras pese a que la ejecución había iniciado. En torno a la corporación, indicó que el Departamento de Estado no

---

[1] Apéndice del Recurrente, págs. 30-38.
[2] Apéndice del Recurrente. págs. 39-49.

le notificó la revocación del certificado de incorporación. Así expuesto, solicitó que el ente administrativo declarase *No Ha Lugar* la reclamación presentada en su contra.

Luego de celebrar tres vistas administrativas[3], el 14 de agosto de 2023, el DACo emitió *Resolución,* notificada el 15 de agosto de 2023, en la cual declaró *Ha Lugar* la reclamación instada contra el Recurrente.[4] En el referido dictamen, formuló las siguientes determinaciones de hechos:

1. La parte querellante Carmen Silva Serrano, es una persona retirada, ejercía la profesión de la medicina, como médico generalista (en lo sucesivo la Querellante).

2. La Querellante contrató los servicios del Ing. José Luis González Cruz para que le realizara unos planos, para la construcción de un muro de contención ya que su residencia localizada en el Bo: Montones del Pueblo de Las Piedras, estaba presentando grietas en el área de la marquesina producto de la inestabilidad del terreno donde está enclavada la residencia1.

3. **El Sr. Manuel Clemente Rosado, es una persona mayor de edad, contratista de trabajos de construcción, casado con Myriam Cecilia Bernier Rodríguez bajo el régimen de Capitulaciones Matrimoniales, la cuales fueron otorgada el 26 de mayo de 2007, ante el notario público Adrián Omar Díaz Díaz**.

4. El Ing. González Cruz le recomendó a los Querellantes, contratar al Sr. Manuel Clemente Rosado para la realización de la construcción del muro de contención.

5. **El 23 de noviembre de 2020 los Querellantes suscribieron un Contrato de Obras (en lo sucesivo el Contrato) con Clember Corp. representada por su Presidente Manuel Clemente Rosado para la construcción de un muro de contención en la residencia de los Querellantes. En la cláusula primera se estableció la siguiente descripción del proyecto**:

   **Descripción del Proyecto: ...La descripción de este proyecto está sujeta al diseño realizado por el Ing. José L. González Cruz. Se construirá muro de contención en acero estructural y concreto. Se realizará acarreo de material propuesto por diseño para rellenar y conseguir nivelación con patio. No se instalará ninguna grama y/o terminado vegetativo en el relleno propuesto. Los detalles de los servicios a ofrecerse bajo la construcción fueron presentados a la Sra. Carmen Silva Serrano y el Sr. Raúl Márquez Cruz mediante cotización. Véase Anejo I "Cotización". Si hubiese una disputa entre los servicios y labores que comprender el presente Contrato de Servicios, prevalecerá lo detallado en la Cotización.**

---

[3] Surge del expediente que el DACo celebró dichas vistas durante los siguientes días: el 16 de febrero de 2023, el 30 de marzo de 2023 y el 4 de mayo de 2023.
[4] Apéndice del Recurrente. págs. 50-63.

6. **Al momento de los Querellantes suscribir el Contrato, no se incluyó el Anejo I de Contrato. El Querellado no presentó evidencia de que los Querellantes firmaran el Anejo I identificado como Cotización, el cual formaría parte del Contrato**.

7. **La Compañía Clember Corp. entró en vigencia el 3 de noviembre de 2017. Sin embargo, a la fecha que los Querellantes firmaron el Contrato con Clember Corp. esa corporación no existía, ya que el 31 de diciembre de 2019, el Secretario de Estado, Elmer L. Román González certificó que la corporación Clember Corp. con número de registro número 401096, había sido cancelada.**

8. **El Querellado a pesar de que sabía que Clember Corp. no existía como Corporación preparó un contrato de obras, compareciendo como Presidente de un ente jurídico inexistente, sin notificarle de esa realidad jurídica a los Querellantes.**

9. **El Querellado no demostró una buena fe contractual cuando representó a una corporación inexistente en la firma de un contrato identificándose como Presidente de la misma, y cobrando los pagos efectuados por la Querellante a una Corporación inexistente. Por tal razón, responde en su carácter personal, de las obligaciones contraídas en el Contrato que firmó con los Querellantes.**

10. **En la cláusula número 4 se estableció la vigencia del contrato y una cláusula de penalidad. En dicha cláusula número 4 se dispuso lo siguiente:**

    **El contrato estará vigente desde la fecha de su ejecución hasta tanto se complete el proyecto de remodelación y construcción y el mismo sea aprobado por el Cliente una vez culminado, salvo que una de las partes termine el Contrato con anterioridad a ello. El término de este contrato podrá ser extendido bajo el consentimiento escrito de ambas partes.**

    **Cláusula de Penalidad: La cotización realizada por Clember a el Cliente indica que el proyecto se realizará en 18 semanas[.] Si el proyecto se atrasa sin que medie justa causa, CLEMBER deberá pagarle al Cliente $20.00 diarios por ¯ cada día de atraso.**

11. **Los trabajos de construcción del muro iniciaron el 25 de noviembre de 2020.**

12. **El Querellado no le envió una comunicación por escrito a los Querellantes solicitándole una extensión de tiempo del contrato como resultado de que sus empleados se hubiesen enfermado por el COVID 19, y tuvieran que guardar cuarentana por esa situación. El Querellado tampoco, presentó una orden de cambio solicitando una de extensión de tiempo del contrato, por los días que la lluvia impidió realizar los trabajos de construcción.**

13. La compensación que recibiría el Querellado sería la cantidad de $55,000.00 cuyos pagos se realizarían de la siguiente forma:

| Tarea | Descripción | Duración | Costo |
|-------|-------------|----------|-------|
| 1. | Firma del Contrato (Comprende 50%) | Firma de Contrato | $27,500.00 |
| 2. | Fundidos de Cimiento (Comprende 15%) | 7 semanas | $8, 250.00 |
| 3. | Fundido 1ra Fase del Muro (Comprende 15%) | 6 semanas | $8,250.00 |
| 4. | Fundido 2da Fase Muro (Comprende 5%) | 6 semanas | $8, 250.00 |
| 5. | Completado relleno (Comprende 5%) | 3 semanas | $2,750.00 |
| 6. | Cerrar contrato en todas sus partes          Total | 16 semanas | $55,000.00 |

14. La Querellante le pagó al Querellado la cantidad de $52,250.00. Los pagos se realizaron durante las siguientes fechas mediante "Manager Check" de la Cooperativa Las Piedras.

    a. 23 de noviembre de 2020 $27, 500.00
    b. 10 de diciembre de 2020 $ 8,500.00
    c. 19 de enero de 2021 $8, 500.00
    d. 9 de febrero de 2021 $ 8,500.00

15. **A pesar de que las fases no estaban completadas la Querellante pagaba las mismas a solicitud del Querellado porque le indicaba a la Querellante que necesitaba dinero para materiales para poder continuar con los trabajos. Para la fecha que la Querellante efectuó el último pago, la obra de construcción del muro estaba a un 75% de construcción**.

16. El Querellado incumplió con la cláusula número 9 del contrato ya que no le entregó a los Querellantes ninguna factura o informe de progreso de la obra contratada a pesar de que la Querellante le solicitaba esa información. La cláusula número 9 del contrato indica lo siguiente:

    Reportes y Factura: CLEMBER Facturar[á] al cliente, inmediatamente por sus servicios terminados en cada fase, proveyendo un reporte y-o factura por escrito de las actividades realizadas durante ese periodo, a partir de la firma de contrato. Los reportes y-o facturas debe[n] ser entregadas a la mano y-o enviados vía correo regular o electrónico a las direcciones que se proveen en el contrato. En la tabla de la Sección 12 de este Contrato se muestra el tipo de servicios que CLEMBER proveerá al Cliente, y una agenda de pagos.

17. **Luego de efectuado el pago de $8,500.00 el 9 de febrero de 2021, el Querellado comenzó a ausentarse de la obra de construcción del muro en la residencia**

de los Querellantes. La Querellante llamó en varias ocasiones al Querellado, quien le informaba que iría el próximo día con su personal, sin embargo, no se presentaba.

18. Con fecha del 27 de mayo de 2021 los Querellantes le enviaron una carta al Querellado en la cual le indicaron que en varias ocasiones lo habían llamado para saber cuándo continuaría con la construcción del muro. También le informaban de su preocupación de su hogar ante la posibilidad del derrumbe del terreno. La carta le fue enviada a la dirección que las partes acordaron para notificar cualquier aviso bajo el contrato de construcción. La cual era la siguiente:

Att. Manuel Clemente Rosado

CLEMBER CORP.
Estancias de Rey 607
Caguas, PR 00725

La carta fue enviada por correo certificado con acuse y recibo. Sin embargo, la misma no fue reclamada por el Querellado.

19. El Querellado dejó el proyecto abandonado, con una fosa profunda, que en la medida que transcurría el tiempo y por las inclemencias del tiempo se aposentaba el agua, y ocurrían deslizamientos que ponían en peligro la estructura de la residencia de los Querellantes.

20. Al momento del Querellado abandonar la obra había construido un 75% del muro.

21. El 23 de julio de 2021 los Querellantes radicaron ante este Departamento la Querella de epígrafe en la cual solicitaron que el Querellado finalizara los trabajos para los cuales fue contratado y lo devolviera el dinero que le pagó. La Querellante se comunicó con el Querellado luego de presentada la Querella y éste le informó que no tenía empleados para continuar la obra.

22. El 12 de agosto de 2021 los Querellante presentaron una Enmienda a la Querella en donde notificaron que contrataron los servicios del Sr. Juan Navarro de LLC Contractor (en lo sucesivo el Sr. Navarro) para continuar la Obra y solicitaron que el Querellado le devuelva el dinero que le pagó en adición a los daños ocasionados por la espera que el Querellado realizara los trabajos.

23. Los trabajos del Sr. Navarro se hicieron en dos fases. La primera fase fue la de mitigación con el propósito de evitar el colapso de la vivienda de los Querellantes ya que había iniciado la temporada de huracanes y las lluvias podían provocar deslizamientos de terrenos y la residencia de los Querellantes colapsar. En la primera fase se estabilizó el terreno, se rellenó el área de construcción.

24. En la primera fase los Querellantes incurrieron en los siguientes gastos:

| Item | Descripción | Costo |
|---|---|---|
| Alquiler de equipos | Movimiento de tierra (sacar la casa de peligro) | $13, 937. 15 |
| Relleno | 40 camiones | $15,610.00 |
| | Total | $29,547.15 |

**25.** **El 8 de diciembre de 2021, la Querellante hizo un contrato con el Sr. Navarro para la terminación del muro. El precio pactado por la mano de obra sin incluir los materiales fue la cantidad de $20,000.00. Ese día la Querellante le entregó al Sr. Navarro la cantidad de $10,000.00 en efectivo como depósito. El balance pendiente de $10,000.00, la Querellante los pagó mediante dos pagos de $5,000 cada uno. El primer pago fue efectuado el día 24 de enero de 2022 y el segundo pago fue efectuado el 3 de marzo de 2022.**

26. **Como resultado del Querellado abandonar la obra, dejó los materiales a la intemperie y el varillaje expuesto sin ningún tipo de protección por lo que el Sr. Navarro, le cobró a la Querellante la cantidad de $4,500.00 para la restauración de la obra y de los materiales que dejaron expuestos**.

27. En gastos de materiales y alquiler de equipos para la segunda fase, la Querellante pagó la cantidad de $15,985.55, lo cual es producto de las siguientes partidas:

| Fecha | Descripción | Costo |
|---|---|---|
| 8-12-2021 | Movimiento de tierra alquiler *digger* y excavadora | $1,500.00 |
| 9-12-2021 | Alquile[r] *digger* y excavadora | $1,500.00 |
| 15-12-2021 | (*Steel Services*) *Reforcing Steel* (16 quintales de varilla) | |
| 1-13-22 | Criollo Ready Mix | $950.75 |
| 1-14-2022 1-15-2022 | Recibo Santana Comercial (varilla) | $225.04 |
| 1-17-2022 | Criollo Ready Mix | $796.11 |
| 1-24-2022 | Dos días alquiler mini-excavadora | $1,500.00 24 |
| 1-25-2022 | 1 día mini-excavadora | $750.00 |
| 1-28-2022 | Criollo Ready Mix | $746.49 |
| 2-1-2022 | Criollo Ready Mix | $548.02 |
| 19-2-2022 | 1 día, Excavadora, *digger* y Rolo | $1, 900.00 |
| 2-3-2023 | Alquiler Bomba para tirar concreto | $250.00 |
| 4-3-2022 | Alquiler de un día y acarreo | $750.00 |
| | TOTAL | $15,988.55 |

28. **El 5 de enero de 2022 el Querellado visitó la residencia de los Querellantes a recoger unos**

**materiales de construcción que había dejado entre los que se encontraban escaleras, andamios, gatos.**

29. El 22 de julio de 2022 la Lcda. María I. Ramos Artunduaga abogada de los Querellantes enmendó la Querella, para que se incluyera como Querellados al Sr. Manuel Clemente Rosado, su esposa y la Sociedad de Bienes Gananciales.

30. La Co-querellada Clember LLC entró en vigencia 28 de Junio de 2021 como una Compañía de Responsabilidad Limitada. Por tal razón, al momento de los Querellantes suscribir el contrato con el Querellado esa corporación no existía.

31. **Para la fecha que los Querellantes contrataron al Querellado para realizar la construcción del muro en su residencia, el Querellado no figuraba inscrito en el Registro de Contratistas de conformidad al Artículo 2 de la Ley Núm. 146 del 10 de agosto de 1995, según enmendada y el Reglamento para el Registro de Contratistas (8172) de este Departamento. Para dicha fecha el Querellado no estaba autorizado a ejercer la profesión de Contratista de la Construcción ya que no contaba con una licencia vigente emitida por este Departamento.[5]** (Énfasis nuestro).

De conformidad a lo anterior, la agencia resolvió que **"[e]l Querellado le hizo una falsa representación a los querellantes, cuando le llevó un contrato para la firma, y ellos partiendo de la buena fe y creencia firmaron el contrato y emitieron pago a una corporación inexistente"**. (Énfasis nuestro).[6] A su vez, dictaminó que, a pesar de las múltiples oportunidades brindadas por los Querellantes, éste incumplió con su obligación al abandonar las obra. En vista de lo anterior, le ordenó pagar $71,536.10 en concepto de las siguientes partidas: (1) $29, 547. 15 por trabajos de mitigación para evitar el colapso de la residencia; (2) $40, 488.95 para finalizar la construcción del muro; y (3) $1,500.00 en honorarios de abogados.

En desacuerdo, el 4 de septiembre de 2023, el Recurrente presentó una *Solicitud de Reconsideración.*[7] En esencia, adujo que la señora Silva Serrano le comunicó vía telefónicamente que no regresase a completar la construcción. Añadió que no obra prueba del expediente que devele que éste conociera sobre la cancelación de

---

[5] Apéndice del Recurrente, págs. 50-56.
[6] Apéndice del Recurrente, pág. 60.
[7] Apéndice del Recurrente, págs. 65-93.

su corporación a la fecha en que firmaron contrato. Por tanto, sostuvo que no actuó de mala fe ni medió dolo de su parte. Examinados los argumentos esgrimidos, el 8 de septiembre de 2024, el DACo emitió *Resolución en Reconsideración*, notificada el 13 de septiembre de 2023, en la cual declaró *No Ha Lugar* la aludida petición.[8]

Inconforme con el dictamen administrativo, el 10 de octubre de 2023, el señor Clemente Rosado acudió ante nos mediante un recurso de *Revisión Administrativa*. En su escrito, presentó los siguientes señalamientos de error:

> DACO cometió error en la apreciación de la prueba y al determinar que las partes recurridas no tenían conocimiento de la cotización cuando de las alegaciones 7 y 8 de la Tercera Querella Enmendada surge que el recurrente les presentó una cotización y las partes recurridas estuvieron de acuerdo con la misma.
>
> DACO cometió error en la apreciación de la prueba y al determinar que la parte recurrente debió presentar evidencia de que los recurridos firmaron la cotización.
>
> DACO cometió error en la apreciación de la prueba y al determinar que las recurridos no tenían conocimiento de la cotización el cual era parte integral del contrato de servicios firmado por las partes cuando del Exhibit III de los recurridos surge que la última página se titula "Anejo I cotización".
>
> DACO cometió error en la apreciación de la prueba y al determinar que a pesar de que las partes recurridas aceptaron que recibieron el contrato de servicios con una página que leía "Anejo I cotización" no recibieron de parte del recurrente la cotización.
>
> DACO cometió error en la apreciación de la prueba y al determinar que a las partes suscribir el contrato el recurrente no incluyó el Anejo I del contrato cuando las partes recurridas aceptaron que recibieron el contrato con una hoja que se titulaba "Anejo I cotización" y una persona prudente y razonable pediría la cotización mencionada en dicha hoja y en la cláusula primera del contrato, y no firmaría un contrato incompleto.
>
> DACO cometió error en la apreciación de la prueba y al determinar que el recurrente sabía que Clember Corp., no existía como corporación cuando las partes firmaron el contrato, cuando las partes recurridas no presentaron prueba del alegado conocimiento del recurrente de la revocación de la corporación por parte del Departamento de Estado y cuando el recurrente testificó, sin ser refutado mediante contra interrogatorio, que desconocía que Clember Corp., no existía a la fecha de la firma de contrato de obras.
>
> DACO cometió error en la apreciación de la prueba y al determinar que el recurrente demostró mala fe contractual cuando representó a una corporación inexistente cuando las partes recurridas no presentaron prueba del alegado

---

[8] Apéndice del Recurrente, pág. 96.

conocimiento del recurrente de la revocación de la corporación por parte del Departamento de Estado y cuando el recurrente testificó, sin ser refutado mediante contra interrogatorio, que desconocía que Clember Corp., no existía a la fecha de la firma de contrato de obras.

DACO cometió error en la apreciación de la prueba y al determinar que el contrato entre las partes requería de una orden de cambio para extender el término del contrato cuando de dicho contrato no surge tal requerimiento para el contrato ser extendido.

DACO cometió error en la apreciación de la prueba y al determinar que las fases o tareas 1, 2 y 3 no estaban terminadas cuando el recurrente requirió los pagos cuando el recurrente testificó y mostró fotos de las obras realizadas durante su testimonio, sin ser refutado mediante el contra interrogatorio o prueba pericial, que dichas fases fueron completadas.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que en el inciso 11 de la cotización, que era parte del contrato entre las partes, se cotizó un protocolo de COVID-19.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que durante la relación contractual entre les partes en Puerto Rico se había declarado una pandemia por el virus COVID-19 mediante la orden ejecutiva 2021-0114.

DACO cometió error en la apreciación de la prueba y al omitir en les determinaciones de hechos que en el inciso 7 del contrato entre las partes surge que las partes debían cumplir con las leyes y regulaciones de salud.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que la co- querellante, Carmen Silva Serrano, es doctora en medicina.

DACO cometió error en la apreciación de la prueba y al determinar que el contrato entre las partes requería que el recurrente le enviara una comunicación por escrito a los recurridos para extender el término del contrato como resultado de que sus empleados se hubiesen enfermado con el virus del COVID-19.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que la doctora en medicina y co-querellante, Carmen Silva Serrano, admitió que tenía conocimiento de que para el mes de febrero y marzo de 2021 si una persona sospechaba que tenía COVID-19, o estuvo expuesta alguien tenía el virus o tenía síntomas, el gobierno ordenó mediante orden ejecutiva 2021-0114 que esa persona debía permanecer en cuarentena catorce (14) días.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que la doctore en medicina y co -querellante, Carmen Silva Serrano, admitió que para el mes de febrero y marzo de 2021 la página 5 de la orden ejecutiva 2021-0114 establecía que el propósito de la cuarentena es mantener a una persona que pudo haber estado expuesta al virus alejada de otras personas y que debía permanecer en su residencia.

DACO cometió error en la apreciación de la prueba y al omitir en les determinaciones de hechos que la doctora en medicina y co -querellante, Carmen Silva Serrano, admitió que conforme a la orden ejecutiva 2021-0114 existía para el mes de febrero y marzo de 2021 una orden de aislamiento que establecía que una persona que haya dado positivo a COVID-

19 debía estar en asilamiento físico por un mínimo de 10 días.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que el recurrente le informó luego del 9 de febrero de 2021 a la doctora en medicina y co-querellante, Carmen Silva Serrano, que varios de sus empleados habían contraído el virus del COVID-19 y que las obras de construcción se suspendían hasta que sus empleados se recuperaban.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que el recurrente y sus empleados se ausentaron desde luego del 9 de febrero de 2021 hasta mediados del mes de marzo 2021 a trabajar en la obra contratada por las partes recurridos a causa de que empelados del recurrente se contagiaron con el virus del COVID-19 y el recurrente en cumplimiento con la orden ejecutiva 2021-0114, el inciso 7 del contrato entras las partes y el protocolo de COVID-19 (que surge de la cotización que es parte del contrato entre las partes), ordenó a sus empleados a estar en cuarentena para evitar la propagación de dicho virus.

DACO cometió error en la apreciación de la prueba y al realizar la determinación de hecho número 17.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que conforme al inciso número 14 del contrato entre las partes los días perdidos o que no se pudiera trabajar en la obra contratada por causa de lluvia, serían considerados una extensión de tiempo para finalizar la obra.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que tanto los recurridos como los empleados del recurrente, tuvieron que colocar carpas sobre la construcción en los meses de marzo, abril, mayo y junio de 2021 para evitar que las lluvias afectaran la obra.

DACO cometió error en la apreciación de la prueba y al omitir en les determinaciones de hechos que la co-querellante, Carmen Silva Serrano, aceptó que para los meses de marzo, abril, mayo, junio del año 2021 hubo episodios de lluvia sobre la obra de construcción y dicho testimonio fue corroborado por el recurrente.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que el recurrente y sus empelados trabajaron en la obra los meses de marzo, abril, mayo, junio del año 2021 cuando no hubo episodios de lluvia.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que el recurrente y sus empleados se ausentaron a la construcción de la obra durante episodios de lluvias y que conforme al inciso número 14 del contrato entre las partes el tiempo para finalizar la obra se extendió.

DACO cometió error en la apreciación de la prueba y al realizar la determinación número 19.

DACO cometió error en la apreciación de la prueba y al omitir en las determinaciones de hechos que la querella fue presentada en DACO el 23 de julio de 2021 y la co-querellante, Carmen Silva Serrano, en conversación telefónica con el recurrente el 28 de julio de 2021 le dijo a este que no fuera más por su casa a trabajar en la obra.

DACO cometió error en la apreciación de la prueba y al realizar la determinación de hecho número 20 pues el recurrente no abandonó la obra contratada, fue la co-querellante, Carmen Silva Serrano, en conversación telefónica con el recurrente el 28 de julio de 2021 quien le dijo a este que no fuera más por su casa a trabajar en la obra.

DACO cometió error en la apreciación de la prueba y al realizar la determinación de hecho número 26 pues el recurrente no abandonó la obra contratada, fue la co-querellante, Carmen Silva Serrano, en conversación telefónica con el querellado el 28 de julio de 2021 quien le dijo a este que no fuera más por su casa a trabajar en la obra.

DACO cometió error en la apreciación de la prueba y al realizar la determinación de hecho número 27 pues omitió incluir que el recurrente pudo entrar a la residencia de los recurridos el 5 de enero de 2022 porque previamente la co-querellante, Carmen Silva Serrano, le autorizó al primero la entrada a su residencia a recoger sus materiales.

DACO cometió error en la apreciación de la prueba al omitir en las determinaciones de hechos que desde que la co-querellante, Carmen Silva Serrano, en conversación telefónica con el querellado el 28 de julio de 2021 le dijo a este que no fue más por su casa, le autorizó por primera vez al recurrente entrar a la residencia el 5 de enero de 2022 a recoger sus materiales.

DACO cometió error al no incluir en la parte dispositiva que se declaraba No Ha Lugar la querella presentada contra la esposa del recurrente, Myriam Cecilia Bernier Rodríguez a pesar de haber determinado como un hecho que entre el recurrente y su esposa rige la total separación de bienes mediante escritura de capitulaciones matrimoniales del 2 de mayo de 2007.

El 16 de octubre emitimos *Resolución* otorgamos a la parte recurrida hasta el 9 de noviembre de 2023 para exponer su posición. Posteriormente, el 20 de octubre de 2023, ordenamos al Recurrente por virtud de *Resolución* a presentar la transcripción de la prueba oral estipulada dentro del término de treinta (30) días e informar si presentaría alegato suplementario.

En vista de lo anterior, el 17 de noviembre de 2023, el señor Clemente Rosado presentóescrito intitulado *Solicitud Prórroga para Presentar la Transcripción Oral.* Evaluada su petición, el 27 de noviembre de 2023, este Tribunal emitió *Resolución* en la cual concedió la prórroga.

Nuevamente, el 26 de enero de 2024, el Recurrente presentó una *Urgente Segunda Solicitud de Prórroga para Presentar la Transcripción Oral.* Tras examinar su solicitud, el 29 de enero de

2024, esta Curia emitió *Resolución,* notificada el 30 de noviembre de 2024, concediendo un término improrrogable a vencer el 15 de febrero de 2024. A su vez, notificamos que de no comparecer dentro del término referido impondríamos severas sanciones.

Luego de ciertos trámites procesales que son innecesarios pormenorizar, el 20 de febrero de 2024, esta Curia emitió *Resolución* ordenando al Recurrente a cumplir con lo dictaminado el 15 de febrero de 2024. Estipulada y acogida la transcripción ordenamos al Recurrente a informar en un término de tres (3) días si presentará alegato suplementario. En respuesta, el 1 de marzo de 2024, el Recurrente presentó una *Moción en Cumplimiento de Orden* en la cual notificó que presentaría el alegato aludido.

Posterior a innumerables trámites procesales, el 21 de marzo de 2024, el Recurrente presentó su *Alegato Suplementario.* En éste, reiteró sus previos señalamientos de error vinculados con la apreciación de la prueba. En síntesis, refutó la inadmisión del *Anejo I de Cotización.* De igual modo, arguyó que la parte recurrida no presentó prueba de la alegada intención de defraudar a los recurridos. Adujo, además, que las fases de construcción se paralizaron por los acontecimientos climatológicos y el COVID-19. Asimismo, aseveró que no finalizó la obra, pues la señora Silva Serrano le instruyó no regresar a trabajar.

Por su parte, el 26 de marzo de 2024, los Recurridos presentaron su *Oposición a Apelación* y la *Réplica a Alegato Supletorio.* En esta última, señalaron que el DACo admitió el *Anejo I de Cotización* como prueba de refutación a favor de la Recurrente. Además, enfatizaron que en la vista del 30 de marzo de 2023 se estableció que dicho documento no contenía las iniciales de los querellantes. Asimismo, puntualizaron que la parte recurrente declaró que no completó la obra, porque no tenía dinero.

Con el beneficio de la comparecencia de ambas partes, exponemos la normativa jurídica aplicable al caso de autos.

## II.

### A. *Facultades adjudicativas del Departamento de Asuntos del Consumidor*

La Ley Orgánica del Departamento de Asuntos del Consumidor, Ley Núm. 5 del 23 de abril de 1973, 3 LPRA sec. 341 (Ley Núm. 5), según enmendada, faculta a la agencia a "adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a derecho". 3 LPRA sec. 341e(d). Véase, además, *Ortiz Rolón v. Armando Soler Auto Sales, Inc.,* 202 DPR 689, 696 (2019); *Amieiro González v. Pinnacle Real Estate Home Team,* 173 DPR 363, 372 (2008). A esos fines, el DACo tiene el deber de velar por el cumplimiento de todas las leyes relacionadas con los derechos de los consumidores. 3 LPRA sec. 341e(d).

Entre otros extremos, el Artículo 6 de la Ley Núm. 5, *supra,* delimita los poderes delegados al referido organismo administrativo:

(c) Atender, investigar y resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía. Cuando declare con lugar una querella, el Secretario ordenará al querellado perdidoso que haya procedido con temeridad que pague total o parcialmente los gastos incurridos por el Departamento en su tramitación. El Secretario dispondrá por reglamento los cargos por concepto de gastos que deberá pagar el querellado perdidoso.

(d) Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación administrativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios aptos conforme a derecho, disponiéndose que las facultades conferidas en este inciso podrá delegarlas el Secretario en aquel funcionario que él entienda cualificado para ejercer dichas funciones.

[...]

(g) Establecer las reglas y normas necesarias para la conducción de los procedimientos administrativos, tanto de reglamentación como de adjudicación, que celebre el Departamento. 3 LPRA sec. 341e.

En virtud de la precitada ley, el DACo adoptó el Reglamento de Procedimientos Adjudicativos, Reglamento 8034, 13 de junio de 2011 (Reglamento 8034). **Dicho cuerpo regulador procura "la**

**solución justa, rápida y económica de las querellas presentadas ante o por el Departamento y proveer un procedimiento uniforme**". Regla 1, Reglamento 8034, *supra.* (Énfasis nuestro).

Su aplicabilidad se extiende a "las investigaciones y los procedimientos administrativos sobre querellas iniciadas por consumidores, o por el Departamento". Regla 3 del Reglamento 8034, *supra.* De igual modo, estas reglas aplican a los procesos adjudicativos impuestos por nueva legislación, exceptuando los términos para llevar a cabo el proceso adjudicativo cuando alguna Ley establece términos distintos, los cuales el Departamento debe adoptar. Íd.

En lo concerniente, la Regla 5.1 establece el procedimiento para presentar una querella ante el DACo:

> Toda querella se inicia y consulta del querellante o del personal del Departamento, donde se expresan los hechos que motivan la reclamación. El Departamento asesorará al querellante sobre los documentos necesarios para radicar la querella. Regla 5.1, Reglamento 8034.

Respecto a este procedimiento, la Regla 4 (t) preceptúa la definición atinente a Querella:

> Reclamación presentada por un consumidor o su representante autorizado solicitando que le sea reconocido un derecho y concedido un remedio. En adición, es una acción iniciada por el Departamento, para hacer cumplir las leyes y reglamentos, e imponer multas o sanciones. Regla 4(t), Reglamento 8034.

En tales escenarios, el DACo ostenta facultad para celebrar vistas administrativas. A esos fines, la Regla 20.1 del Reglamento 8034, *supra,* dispone que "[l]as vistas administrativas serán celebradas en la Oficina Regional a tenor con la Regla 6 de este reglamento". Asimismo, en dicho procedimiento es permisible la presentación de material probatorio:

> Las partes podrán presentar aquella evidencia documental y testifical incluyendo evidencia de carácter técnico y pericial. El oficial examinador, el Juez Administrativo, Secretario o Panel de Jueces, podrán tomar conocimiento administrativo, a iniciativa propia o a solicitud de parte, sobre aquellos hechos o circunstancias de interés público que son conocidas por todas las personas bien informadas; o que son

susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada. Regla 20.5 de Reglamento 8034, *supra.*

De conformidad a la Regla 24 del Reglamento 8034, *supra*, la aplicación de las Reglas de Evidencia no es estricta:

> Las Reglas de Procedimiento Civil y de Evidencian no serán de estricta aplicación a las vistas administrativas, sino en la medida en que el Funcionario o Panel de Jueces que presida la vista o el Departamento estime necesario para llevar a cabo los fines de la justicia.

Celebrada la vista administrativa, el Juez Administrativo estará en posición de emitir una resolución que exhiba los siguientes componentes:

> La resolución de la querella en sus méritos contendrá una relación de la determinación de hechos probados, la cual se ajustará y tendrá apoyo en el expediente del procedimiento, conclusiones de derecho, y dispondrá lo que en Derecho proceda para su ejecución mediante una orden e incluirá los apercibimientos para solicitar revisión judicial.

La determinación agencial deberá estar respaldada en evidencia sustancial, es decir, "evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Regla 4(i), Reglamento 8034, *supra*. Además, incluirá la correspondiente concesión de remedios:

> Toda resolución otorgará el remedio que en derecho proceda aun cuando la parte querellante no lo haya solicitado. Cuando el remedio otorgado sea una orden de hacer o cumplir con un acto determinador deberá contener, (1) cuando surja del expediente o (2) cuando se pueda tener conocimiento administrativo, el importe o valor monetario de la orden, para que en la alternativa de no cumplir con la misma, la parte obligada compense monetariamente. Regla 27.1, Reglamento 8034, *supra*.

También, se "podrá imponer a la parte perdidosa el pago de costas y honorarios de abogados". Regla 27.3, Reglamento 8034, *supra.*

### B. La figura de la buena fe y las obligaciones contractuales

El Artículo 1206 del Código Civil de Puerto Rico de 1930,[9] dispone que "[e]l contrato existe desde que una o varias personas

---

[9] El Código Civil de 1930 fue derogado mediante la aprobación de la Ley Núm. 55 de 1 de junio de 2020, según enmendada, mejor conocida como *Código Civil de*

consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." 31 LPRA ant. sec. 3371. Las obligaciones que nacen de los contratos serán ley entre las partes, quienes estarán obligadas a cumplir con éstos. Artículo 1044 del Código Civil, 31 LPRA ant. sec. 2994. Dicha normativa contractual se rige "por los principios de la autonomía de la voluntad y *pacta sunt servanda*". *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014). Esta autonomía está estrechamente entrelazada con el principio de la buena fe contractual. *BPPR v. Sunc. Talavera*, 174 DPR 686, 693 (2008).

La buena fe es generadora de deberes y de un marco ético-moral exigible en todas las etapas de la relación contractual. *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 61 (2011). En armonía con lo anterior, el Artículo 1210 del Código Civil, *supra*, alude a este principio cardinal:

> Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. 31 LPRA ant. 3375

Por tanto, la obligatoriedad de los contratos no se limitada a lo pactado propiamente en dicho acuerdo, "**sino que abarca todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley**". *Oriental Bank v. Perapi*, *supra*, pág. 15. (Énfasis nuestro).

A la luz de tales principios, el Artículo 1217 del Código Civil dispone que "[s]erá nulo el consentimiento prestado por error, violencia, intimidación o dolo". Como consecuencia, quedan sujetos a la indemnización de daños y perjuicios, quienes en cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y

---

*2020*, 31 LPRA sec. 5311. No obstante, puntualizamos que los hechos que dan lugar a la presente reclamación surgen el 23 de noviembre de 2020, previo a la aprobación del *Código Civil de 2020*. En vista de lo anterior, aplicaremos las disposiciones del derogado Código Civil de1930.

los que de cualquier modo contravinieren al tenor de aquéllas. 31 LPRA ant. sec. 3018.

De igual modo, existen alternativas para atender aquellos escenarios provocados por el incumplimiento de obligaciones de naturaleza recíprocas. Recordemos, pues, que los contratos son "negocios jurídicos bilaterales y, en nuestro ordenamiento, constituyen una de las varias formas en que las personas pueden obligarse entre sí". *Amador v. Conc. Igl. Univ. De Jesucristo*, 150 DPR 571, 581 (2000); *Santiago Nieves v. A.C.A.A.,* 119 DPR 711, 718 (1987). Ante el incumplimiento de una parte, el Artículo 1077 del Código Civil, *supra*, provee los siguientes mecanismos:

> La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.
>
> El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.
>
> El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo. 31 LPRA ant. sec. 3052.

En lo atinente, el Tribunal Supremo de Puerto Rico estableció la siguiente interpretación jurisprudencial:

> Ante el incumplimiento de la otra parte, el perjudicado puede exigir el cumplimiento de la obligación en la forma específicamente debida o la resolución del mismo;4 solicitar el cumplimiento mediante la obtención del equivalente económico de la prestación debida y, a la vez, pedir la indemnización de daños y perjuicios resultantes de la repercusión del incumplimiento en su patrimonio. *Master Concrete Corp. v. Fraya, S.E.,* 152 DPR 616, 625 (2000), citando a J. Puig Brutau, *Fundamentos de Derecho* Civil, 4ta ed., Barcelona, Ed. Bosch, 1988, T. IV, Vol. 2, pág. 409.

Lo anterior implica que "si uno de los contratantes incumple, el otro puede darlo por resuelto sin necesidad de que un tribunal así lo declare". *Álvarez v. Rivera*, 165 DPR 1, 19 (2005).

### C. El contrato de arrendamiento de obras y servicios

El Artículo 1434 del Código Civil de Puerto Rico, 31 LPRA ant. sec. 4013, establece que "[e]n el arrendamiento de obras o servicios,

una de las partes se obliga a ejecutar una obra, o a prestar a la otra un servicio por precio cierto". Sobre este tipo de contrato, el Tribunal Supremo de Puerto Rico distingue la particularidad de un contrato de obra y un contrato de servicio:

> En el contrato de obras se promete un resultado [la obra hecha] con independencia del trabajo ... necesario para realizarlo; y en el segundo [el de servicios] se promete la prestación de los servicios en sí mismos —el dedicarse ... a las labores domésticas, por ejemplo— con independencia del resultado (de la cantidad de obra o de tarea) que con él se haya concluido *Constructora Bauzá, Inc. v. García López,* 129 DPR 579, 592 (1991), citando M. Albaladejo, *Curso de Derecho Civil español común y foral,* Barcelona, Librería Bosch, 1977, T. II, págs. 450–451.

En el contrato de obra, "[e]l contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o reglas profesionales." *Master Concrete Corp. v. Fraya, S.E.,* 152 DPR 616, 624 (2000). Por tratarse el arrendamiento de obras de un contrato bilateral, consensual y oneroso, el incumplimiento de una parte le da derecho a la otra a resolver el contrato o a exigir su cumplimiento específico, más la indemnización por los daños y perjuicios causados. *Constructora Bauzá, Inc. v. García López, supra,* pág. 592-593; Véase, además, Art. 1077 del Código Civil, *supra.*

### D. Vida jurídica de las corporaciones

El Artículo 27 del Código Civil, *supra,* establece que son personas jurídicas las corporaciones con personalidad jurídica reconocida por la ley. 31 LPRA ant. sec. 101. Dicha personalidad empieza desde el instante mismo, en que con arreglo a derecho, hubiesen quedado válidamente constituidas. 31 L.P.R.A. ant. sec. 101. En armonía con lo anterior, la Ley General de Corporaciones, la Ley Núm. 164 de 16 de diciembre de 2009, 14 LPRA sec. 3501(b), según enmendada, dispone que "**las corporaciones podrán establecerse al amparo de esta Ley para la realización o promoción de cualquier negocio o propósito lícito, excepto los proscritos por la Constitución y las leyes del Estado Libre**

**Asociado**". (Énfasis nuestro). La precitada ley "es el estatuto especial por virtud del cual se deben atender los cuestionamientos relativos a la existencia y vida jurídica de las corporaciones privadas". *Eagle Security Police, Inc. v. Dorado,* 2023 TSPR 5, 211 DPR __; *Dorado del Mar v. Weber, et als.*, 203 DPR 31, 45 (2019).

Cónsono con lo anterior, cualquier persona natural con capacidad legal o cualquier persona jurídica, **por sí o en unión a otras,** podrá incorporar u organizar una corporación al amparo de esta Ley, mediante la radicación de un certificado de incorporación ante el Departamento de Estado. 14 LPRA sec. 3501(c). La emisión del certificado de incorporación por el Secretario de Estado constituye evidencia *prima facie* de: (1) otorgamiento y presentación; (2) cumplimiento de todos los actos necesarios para que el documento sea efectivo; y (3) cualesquiera otros hechos permitidos o requeridos en el documento. 14 LPRA sec. 3504.

El Artículo 1.05(a) de la Ley de Corporaciones, *supra*, prescribe cuándo inicia la vida jurídica de la corporación:

> Otorgado y radicado el certificado de incorporación, según lo dispuesto en el inciso (D) del Artículo 1.03 de esta Ley y pagados los derechos requeridos por ley, la persona o las personas que de tal modo se asociaren, sus sucesores y sus cesionarios, constituirán, a partir de la fecha de dicha radicación, o de haberse establecido en el certificado de incorporación, desde una fecha posterior que no exceda de noventa (90) días, una entidad corporativa con el nombre que aparezca en el certificado, sujeta a disolución según se dispone en esta Ley. 14 L.P.R.A. sec. 3505(a).

En *Eagle Security Police, Inc. v. Dorado, supra,* el Tribunal Supremo de Puerto Rico explicó que el término *certificado de incorporación* abarca "**todos los certificados, acuerdos de fusión o consolidación, planes de reorganización u otros instrumentos que sean radicados [...] y que tenga[n] el efecto de enmendar o suplementar de alguna forma el certificado de incorporación original de una corporación**". (Énfasis nuestro).

En el contexto de fusión corporativa, el Artículo 10.01 de la Ley de Corporaciones, *supra*, dispone que si si el acuerdo fuere así

adoptado y certificado por cada corporación constituyente, entonces se radicará en el Departamento de Estado y entrará en vigor, con arreglo al Artículo 1.03 de esta Ley. 14 LPRA sec. 3731(c). De manera similar, el referido estatuto permite radicar ante el Departamento de Estado un certificado de fusión que sea otorgado con arreglo del Artículo 1.03 de la Ley de Corporaciones. 14 LPRA sec. 3731(c).

Debidamente organizada en ley, la corporación ostenta la facultad para otorgar contratos y garantías e incurrir en responsabilidades. 14 L.P.R.A. sec. 3522(l). A su vez, tiene capacidad para "[d]emandar y ser demandada bajo su nombre corporativo en cualquier Tribunal y participar en cualquier procedimiento judicial, administrativo, de arbitraje o de cualquier otro género". 4 LPRA sec. 3522(b). No obstante, "**[t]odas las personas que actúen como corporación sin autoridad para ello, serán responsables solidariamente de todas las deudas y obligaciones incurridas o asumidas como resultado de esta actuación**". 14 LPRA sec. 3505(c). (Énfasis nuestro).

**E. Cancelación de incorporación por no rendir informe anual**

El Artículo 15.01 de la Ley de Corporaciones, *supra*, exige el cumplimiento de rendición de informe:

> Toda corporación organizada al amparo de las leyes del Estado Libre Asociado deberá radicar anualmente en las oficinas del Departamento de Estado o por Internet no más tarde del día quince (15) de abril, un informe certificado, bajo pena de perjurio, conforme al Artículo 1.03 (A) y (B), por un oficial autorizado, un director o el incorporador. 14 LPRA sec. 3851.

La inobservancia de este deber implica serias consecuencias sobre la vida de la entidad corporativa. El Artículo 15.02 de la Ley de Corporaciones, *supra*, contempla la imposición de multas administrativas y penalidades por no radicar el informe:

> Si una corporación doméstica dejare de radicar el informe anual requerido por ley durante dos (2) años consecutivos, se autoriza al Secretario de Estado a revocar el certificado de incorporación de tal corporación. Por lo menos sesenta (60) días antes de revocar el certificado de incorporación, el

Secretario de Estado notificará a la corporación afectada de sus intenciones de revocar, enviando una notificación por correo de tales intenciones al agente residente de tal corporación según conste en sus archivos.

El Secretario de Estado deberá establecer por reglamento aquellas otras disposiciones que sean necesarias para instrumentar el procedimiento de multas administrativas y otras penalidades que se establece en este Artículo.

**Una vez cancelado de pleno derecho el certificado de incorporación, el Secretario de Estado notificará de dicha cancelación al Secretario de Hacienda.** 14 LPRA sec. 852. (Énfasis nuestro).

### F. Estándar de revisión judicial de las determinaciones administrativas

Como es sabido, "los tribunales apelativos han de conceder gran deferencia a las decisiones de los organismos administrativos". *Oficina del Comisionado de Seguros de Puerto Rico v. Point Guard Insurance Company, Inc.*, 205 DPR 1005, 1026 (2020*); Asoc. FCIAS. v. Caribe Specialty II*, 179 DPR 923 (2010). Las determinaciones agenciales gozan de experiencia y conocimiento especializado sobre los asuntos ante su consideración". *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79, 88 (2022); *Capó Cruz v. Junta Planificación et al.*, 204 DPR 581, 591 (2020). (Citas omitidas).

Por tal razón, los foros judiciales limitan su facultad revisora a los siguientes aspectos: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial, y (3) si las conclusiones de derecho fueron correctas. *Capó Cruz v. Jta. de Planificación et al., supra.* (Cita omitida).

Ahora bien, la deferencia a las determinaciones agenciales no es absoluta. No podemos imprimir un sello de corrección a las determinaciones o interpretaciones administrativas irrazonables, ilegales o contrarias a derecho. *Super Asphalt Pavement, Corp. v. Autoridad para el Financiamiento de la Infraestructura de Puerto Rico*, 206 DPR 803, 819 (2021). Por tanto, la deferencia cede cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación

de las leyes o reglamentos;(3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *Capote Rivera v. Voili Voila Corporation*, 2024 TSPR 29, 213 DPR __; *Super Asphalt Pavement, Corp. v. AFI y otro, supra.*

A tenor con lo anterior, "**la parte que impugna judicialmente las determinaciones de hechos de una agencia administrativa tiene el peso prueba para demostrar que éstas no están basadas en el expediente o que las conclusiones a las que llegó la agencia son irrazonables**". *Oficina de Ética Gubernamental v. Martínez Giraud, supra,* pág. 89. (Énfasis nuestro). En esa dirección, la evidencia sustancial es aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Capó Cruz v. Jta. de Planificación et al., supra.*

Por otro lado, "cuando de conclusiones de derecho se trata, los tribunales tenemos una amplia facultad de revisarlas completa y absolutamente". *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 745 (2012); *Assoc. Ins. Agencies, Inc. v. Com. Seg.* P.R., 144 DPR 425, 436 (1997). A esos fines, la Sección 4.5 de la Ley de Procedimiento Administrativo, *supra,* dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos". Lo anterior "no equivale a la sustitución automática del criterio e interpretación del organismo administrativo". *Capó Cruz v. Junta de Planificación, supra,* pág. 591; *Rolón Martínez v. Caldero López,* 201 DPR 26, 36 (2018). La determinación de una agencia merece deferencia sustancial aun cuando su interpretación no sea la única razonable. *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1003 (2011). Véase, también, *De Jesús v. Depto. Servicios Sociales,* 123 DP. 407, 418 (1942). Solo se sustituye "el criterio de la agencia por el del tribunal revisor cuando no exista una base racional para explicar la decisión administrativa.

*Capote Rivera v. Voili Voila Corporation, supra; Capó Cruz v. Jta. de Planificación et al, supra,* pág. 591.

**III.**

Tras evaluar sosegadamente el recurso ante nuestra consideración, así como la prueba que obra en el expediente y la transcripción estipulada por las partes, determinamos que el DACo actuó correctamente. La *Resolución* recurrida descansa en la totalidad de la prueba admitida por la agencia y es cónsona al derecho vigente. Por estar estrechamente relacionados los errores, pasamos a resolverlos de manera conjunta.[10] Veamos.

En el presente caso, el señor Clemente Rosado argumenta que erró la agencia al concluir que desplegó una conducta de mala fe por representar una corporación inexistente durante el trámite de contratación. En específico, contiende que los recurridos debieron presentar prueba que demostrara que éste conocía sobre el certificado de revocación de incorporación.

No encontramos criterios jurídicos para acoger dicho señalamiento de error. Durante la celebración de las vistas administrativas, la parte recurrida presentó amplia prueba documental y oral que contradice el argumento esbozado por el Recurrente. En específico, destacamos que éste admitió que no radicó el informe anual corporativo requerido por el Departamento de Estado:

> LCDA. RAMOS: Volvemos y repetimos la ca, la pregunta. Le pregunto desde su creación Clember Corp. no radicó sus informes anuales en el Departamento de Estado. ¿Sí o no? ¿No se radicó?
>
> SR. MANUEL CLEMENTE: Yo tenía un contable que se encargaba de eso.
>
> **LCDA. RAMOS: ¿Sí o no? ¿No se radicó?**

---

[10] Debido a que el Recurrente presentó treinta y tres señalamientos de error -con argumentos repetitivos- hemos decidido atender los mismos mediante las siguientes temáticas: (1) la inexistencia de la corporación, (2) la admisión del *Anejo I de Cotización* (3) la extensión del término, (3) las inclemencias del tiempo, (4) la pandemia del COVID-19, (5) el abandono de la obra y (6) la separación de bienes de conformidad a la escritura de *Capitulaciones Matrimoniales*.

**SR. MANUEL CLEMENTE: Pues no sé. No.** (Énfasis nuestro).[11]

Cónsono con la declaración testimonial precitada, el DACo admitió como Exhibit el *Certificado de Revocación del Certificado de Incorporación* expedido por el Departamento de Estado:

**CERTIFICO: Que "CLEMBAR CORP", registro número 401096, ha sido cancelada según lo establece la Ley General de Corporaciones, el 31 de diciembre de 2019 a las 12:00 AM**. (Énfasis nuestro).[12]

A la luz de lo anterior, resulta evidente que el Recurrente conocía sobre el estado de inexistencia de su corporación. Ante tal realidad, se limitó a testificar que la aludida corporación fue fusionada con Clember LLC:

LCDO. QUINTERO: ¿Caballero qué es Clember Corp?

SR. MANUEL CLEMENTE: Clember Corp. es una compañía que yo presidía la cual fusionamos con Clember, LLC.

LCDO. QUINTERO: ¿Clember Corp. de cuándo estuvo activa?

SR. MANUEL CLMENTE: Estuvo activa aproximadamente como unos tres años y medio.

LCDO. QUINTERO: ¿Recuerda cuándo comenzó Clember, Corp? Más o menos no tiene que ser exacto.

SR. MANUEL CLEMENTE: Ah, como el veinte diecisiete, veinte dieciocho por ahí.

LCDO. QUINTERO: Okay. Y dijo usted que ahora está fusionada.

SR. MANUEL CLEMENTE: Está fusionada con Clember, LLC.[13]

Sin embargo, dicha argumentación solo descansó en su testimonio, por tanto, no mereció credibilidad del Juez Administrativo. Cónsono con lo antes expuesto, el Recurrente no presentó prueba del certificado de incorporación o el acuerdo de fusión corporativa. En vista de ello, no contamos con los elementos probatorios necesarios para disponer que las partes contrajeron un contrato con entidad corporativa fusionada. Por tanto, resolvemos que el señor Clemente **Rosado pactó una obligación contractual en representación de una corporación inexistente. Tal**

---

[11] TPO de vista administrativa del 4 de mayo de 2023, págs. 116-117.
[12] Apéndice de los Recurridos, pág. 136.
[13] TPO de la vista administrativa del 4 de mayo de 2023, pág. 7.

**actuación es contraria a la buena fe contractual imperante en nuestro ordenamiento jurídico, que procura la honestidad y la lealtad entre las partes. En efecto, responde en el plano personal ante la reclamación administrativa presentada en su contra.** (Énfasis nuestro).

Por otro lado, el Recurrente alega que incidió DACo al no admitir en evidencia el *Anejo I de la Cotización*, toda vez que dicho documento es parte integral del contrato. Asevera que la admisión del *Anejo I* es importante porque recoge el contenido relacionado al protocolo del COVID-19 que los querellantes incumplieron.

Por su parte, los Recurridos puntualizan que la parte recurrente nunca señaló que el contrato estaba incompleto. Advierten que presentó sorpresivamente el documento en cuestión en el periodo de las vistas administrativas. No obstante, especifican que el DACo admitió la cotización como prueba de refutación. En lo pertinente, esbozamos el testimonio de la señora Silva Serrano, quien declaró que no tenía conocimiento acerca del *Anejo I*:

> SRA. CARMEN SILVA: Este documento no lo había visto.
>
> LCDO. QUINTERO: Préstemelo acá. Este no fue la cotización que le presentó su abogada cuando usted testificó el primer día al que usted hizo referencia varias veces.
>
> LCDA. RAMOS: Objetamos.
>
> SRA. CARMEN SILVA: No.
>
> LCDO. QUINTERO: No. ¿Usted nunca ha visto este documento?
>
> SRA. CARMEN SILVA: Nunca lo he visto hasta ahora.[14]

Luego de un amplio debate, el Juez Administrativo limitó la presentación del referido documento como prueba de refutación a favor del querellado.[15] Eventualmente, en la vista del 4 de mayo de 2023, resolvió que los Recurridos no estamparon sus iniciales en el *Anejo I*, el cual se encuentra en blanco:

> JUEZ: No. No, pero pero para aclarar el asunto. Mire yo, en el expediente obra el contrato original, aunque se tiene como Exhibit una copia. En el expediente está el contrato original,

---

[14] TPO de la vista administrativa del 30 de marzo de 2023, pág. 130.
[15] TPO de vista administrativa del 30 de marzo de 2023, págs. 140-142.

> aunque se tiene como Exhibit solo una copia. En el expediente está el contrato original que suscribieron las partes, tiene una, está timbrado en colores, Clember Corporation en colores del veintitrés de noviembre del veinte veinte en la ciudad de Las Piedras. Cada una de las hojas tienen las iniciales del contrato que obra aquí, cuatro, cinco donde en la número seis dice en la siguiente tabla encontraremos las tareas y descripciones. Cinco, seis, siete, tiene la firma de las partes. **Y ocho la cotización está en blanco, en ninguna de las partes inició. O sea, si se va a hacer referencia a una cotización pues yo creo que en el contrato tiene que aparecer un papel donde causa una de las partes haya iniciado como aceptado o presentó.**
>
> LCDO. QUINTERO: Señoría, estaremos pidiendo la objeción el, tenemos.
>
> JUEZ: **Y le adelantamos hasta el día, que al día de hoy, eh, ni en las contestaciones, ni en ningún escrito esa, esa, se incluyó esa, esa se incluyó esa, esa cotización que está en blanco**. Porque entiendo que la página doce, en la página del contrato tiene, tiene detallado lo, las tareas que se iban a hacer a la firma, como bien explicó el querellado eh, tenía un costo de veintisiete mil quinientos dólares que había que entregarle para empezar la obra porque no era un contrato que él asumía, sino que por fase me imagino cada vez que había una fase se certificaba, este mire terminé eh, fundido el cimiento que era un quince por ciento, porque establecieron los hasta los porciento. Terminé, eh, tienen que pagarme otro para yo seguir tirando la siguiente fase. Esto es lo que está en el contrato. Adelante compañero.[16]

Expuesto lo anterior, reiteramos que el juzgador de los hechos emitió un análisis probatorio a la luz de los documentos que obran en el expediente. No obstante, concedió el valor probatorio que correspondía al *Anejo I* presentado de conformidad a las declaraciones testificales y los argumentos debidamente atendidos. **Así concluyó acertadamente que los Recurridos no estamparon su iniciales en el documento en controversia y que éste se encontraba en blanco**. (Énfasis nuestro).

En torno al incumplimiento contractual, el señor Clemente Rosado aduce que no concluyó las labores pactadas, porque la señora Silva Serrano le solicitó que no regresara a trabajar. Indicó, además, que sus empleados se ausentaron por los continuos episodios de lluvias y la pandemia del COVID-19. También, alega que la parte recurrida extendió el plazo de la obra.

---

[16] TPO de la vista administrativa del 4 de mayo de 2023, págs. 22-23.

Hemos revisado el material probatorio del expediente, sin embargo, no encontramos elementos para sustentar tales aseveraciones. A esos fines, resaltamos las siguientes cláusulas establecidas en el *Contrato de Servicio*:

> 4. <u>Vigencia del Contrato</u>: El contrato estará vigente desde la fecha de su ejecución hasta tanto se complete el proyecto de remodelación y construcción y el mismo sea aprobado por el Cliente una vez culminado, salvo que una de las partes termine el Contrato con anterioridad a ello. **El término de este contrato podrá ser extendido bajo consentimiento escrito de ambas partes**.
>
> Cláusula de Penalidad: La cotización realizada por CLEMBER a el [sic] cliente indica que el proyecto se realizará dentro de 18 semanas. Si el proyecto se atrasa sin que medie justa causa, CLEMBER deberá pagarle a el [sic] Cliente $20.00 diarios por cada atraso.[17]
>
> [...]
>
> 14. <u>Eventualidades de Incumplimiento</u>: Las siguientes eventualidades se considerarán como incumplimiento bajo el presente contrato:
>
> El incumplimiento de CLEMBER a los términos de este contrato, si dicho incumplimiento no ha sido subsanado durante los quince (15) días calendarios siguiente, debe habérsele notificado a la Sra. Carmen Silva Serrano.
>
> El incumplimiento de el [sic] Cliente a los términos de este contrato, si dicho incumplimiento no ha sido subsanado durante los quince (15) días calendarios siguiente, debe habérsele notificado a CLEMBER.
>
> **De tener días perdidos por lluvias serán considerados para la extensión de tiempo de este contrato.**
>
> 15. Terminación**: De CLEMBER incurrir en Incumplimiento de una de sus obligaciones bajo este Contrato, y luego de transcurridos los 15 para que subsane dicho incumplimiento, el Cliente podrá terminar automáticamente este Contrato. (Énfasis nuestro).** [18]

**No se desprende del expediente ante nuestra consideración, que el término de la obra se haya extendido bajo consentimiento escrito de ambas partes, tal como prescribe la cláusulas contractual cuatro (4).** (Énfasis nuestro). Tampoco advertimos prueba que demuestre que el trabajo se paralizó por acontecimientos climatológicos o por la situación del COVID-19. En particular, destacamos que la señora Silva Serrano testificó que el Recurrente no le notificó que sus empleados enfrentaban problemas de COVID-19:

---

[17] Apéndice de los Recurridos, pág. 18.
[18] Apéndice de los Recurridos, pág. 20.

LCDO. QUINTERO: ¿Dama en el mes de febrero del dos mil veintiuno le informó a usted que varios de sus empleados habían contraído COVID, sí o no?
SRA. CARMEN SILVA: No.

LCDO. QUINTERO: ¿Usted reitera que fue uno?

SRA. CARMEN SILVA: Uno solo.

LCDO, QUINTERO: Okay. ¿Le pregunto mire a ver si en febrero del dos mil veintiuno el señor Manuel Clemente le informó a usted que las obras de construcción se suspendían hasta que sus empleados se recuperaran del COVID-19, sí o no? Pues dama sim e permite terminar la pregunta puedo escuchar su contestación. ¿Mire a ver si en febrero del dos mil veintiuno Manuel Clemente le informó a usted que las obras de construcción se suspendían hasta que empleados suyos se recuperaran del COVID-19, sí o no?

SRA. CARMEN SILVA: No.

LCDO. QUINTERO ¿Dama le pregunto si en marzo del dos mil veintiuno el señor Manuel Clemente le informó a usted que todavía los empleados de él no se habían recuperado del COVID-19, sí o no?
SRA. CARMEN SILVA: No.[19]

Según el testimonio de la parte recurrente, los empleados se ausentaban de manera prolongada:

SRA. CARMEN SILVA: Es que fueron y vinieron. Iban y venían, pero se ausentaban por periodos largos. Pero el último día de todo el trabajo fue el 28 de julio de 2021.[20]

De hecho, diligentemente cursó una carta al Recurrente en la cual aludió a las previas conversaciones telefónicas relacionadas con al estado de la obra. En lo atinente, esbozamos el siguiente contenido:

27 de mayo de 2021

Estimado Sr. Clemente:

Por medio de la presente le expongo amablemente mi preocupación en relación al muro. Vez tras vez le he llamado para preguntarle cuándo continuará con la construcción del muro. Cómo [sic] en las llamadas del 22 de marzo de, 27 y 29 de abril entre otras.

En dichas llamadas le he pedido que me complete la construcción del muro como se ha acordado. Me ha prometido seguidamente que las próximas semanas seguirá el trabajo hasta terminarlo. Al día de hoy no me ha cumplido con el acuerdo establecido. Antes bien los materiales de construcción se encuentran en total abandono entre el pasto causándome dificultad en la poda.

No se ha preocupado por la condición de mi hogar en peligro de derrumbe del terreno "posibilidad real". Como es de su conocimiento el terreno no es del todo firme y estamos frente a la época de huracanes, mi mayor preocupación.

En vista de los hechos le comunico por escrito las circunstancias presentes. La cual deberá ser contestada en

---

[19] TPO de la vista administrativa del 30 de marzo de 2023, págs. 152-154.
[20] TPO de la vista administrativa del 16 de febrero de 2023, pág. 54.

un término de cinco días a partir de recibir la misma. De lo contrario, el contrato se dará por terminado.

Cordialmente,

Carmen Silva Serrano & Raúl Márquez Cruz [21]

Asimismo, testificó que luego de presentar la *Querella* administrativa, dialogó vía telefónica con el Recurrente, pero éste le comunicó que no tenía personal para concluir la obra:

LCDA. RAMOS: ¿Ya sometida la querella, usted tuvo algún acercamiento al señor Clemente para completar la obra?

SRA. CARMEN SILVA: Eh, sí. En esa, en esa llamada que me hizo, que me gritó por teléfono cuando yo lo pedí que, eh, la obra tenía que completarla. Él me dijo que ya no tenía personas para trabajar, que no podía terminar la obra.[22]

Por cierto, tal testimonio es consistente con la versión testimonial que presentó el señor Clemente Rosado, quien reconoció que no terminó la obra por falta de dinero:

LCDA. RAMOS: ¿Lo cierto es que usted no pudo terminar la obra porque ya no tenía dinero para terminarla verdad?

SR. MANUEL CLEMENTE: Bueno.

LCDA. RAMOS: ¿Sí o no?

SR. MANUEL CLEMENTE: Pues sí.[23]

En vista de lo anterior, nos resulta forzoso concluir que la parte recurrente incumplió con el acuerdo contractual. A pesar de que alude a eventualidades climatológicas y a la pandemia, no nos posiciona a la luz de la prueba presentada para resolver que su incumplimiento es producto es tales sucesos. No surge del expediente que haya notificada a la parte recurrida sobre dichas circunstancias, tal como exige el contrato. Más bien, desplegó un patrón de indiligencia, que provocó serios problemas sobre la seguridad de los recurridos y múltiples gastos económicos.

Por motivo del abandono de la obra, el 8 de diciembre de 2021 la parte recurrida formalizó un *Contrato* con el señor Juan Navarro para completar las fases restantes de la obra inacabada.[24] Este otro

---

[21] Apéndice de los Recurridos, pág. 27.
[22] TPO de la vista administrativa del 16 de febrero de 2023, pág. 77.
[23] TPO de la vista administrativa del 4 de mayo de 2023, pág. 166.
[24] Apéndice de los Recurridos, pág. 31

acuerdo requirió que las partes incurrieran en un gasto adicional de $10,000.00 en aras de resolver el problema ocasionado por el incumplimiento contractual del querellado.

Por último, la parte recurrente alega que incidió el DACo al no incluir en la parte dispositiva de la *Resolución* una declaración de *No Ha Lugar* en cuento la reclamación presentada en contra de Myriam Cecilia Bernier, quien es esposa de la parte recurrente. No obstante, hacemos constar y destacamos que la agencia recurrida admitió como Exhibit 1 las *Capitulaciones Matrimoniales* otorgadas entre la parte recurrente y su esposa. Por lo anterior, formuló la determinación de hechos número tres (3):

> **3. El Sr. Manuel Clemente Rosado, es una persona mayor de edad, contratista de trabajos de construcción, casado con Myriam Cecilia Bernier Rodríguez bajo el régimen de Capitulaciones Matrimoniales, la cuales fueron otorgada el 26 de mayo de 2007, ante el notario público Adrián Omar Díaz Díaz**.[25]

Reconocido ese hecho, nos limitaremos a especificar que en las escrituras de *Capitulaciones* consta la siguiente disposición:

> De igual manera estipulan los futuros contrayentes, que toda y **cualquier deuda y obligación que cada uno de ellos respectivamente tenga antes del matrimonio o contraída después matrimonio será de la exclusiva responsabilidad del cónyuge que haya contraído la deuda sin que el otro cónyuge tenga responsabilidad alguna en tal deuda o deudas**. (Énfasis nuestro). [26]

Por tanto, admitida dicha prueba y formulada la determinación fáctica precitada, es evidente que el Recurrente responde en su carácter individual ante la reclamación administrativa instada en su contra.

A tenor con lo anterior, determinamos que la parte recurrente no alcanzó a rebatir la presunción de corrección y legalidad que reviste las determinaciones emitidas por el DACo. La *Resolución* recurrida merece nuestra deferencia, pues no es arbitraria, irrazonable ni caprichosa. Constituye un dictamen cónsono con los

---

[25] Apéndice del Recurrente, pág. 51.
[26] Apéndice de los Recurridos, pág. 84.

preceptos legales aplicables y respaldado en evidencia sustancial que obra del expediente administrativo.

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Resolución* recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones